IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| **MCALISTER DESIGN** | : | |
| **INCORPORATED,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **No. 3:20-CV-17 (CAR)** |
| **v.** | : | |
| | : | |
| **EATON CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | : | |

## <u>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Currently before the Court is Defendant Eaton Corporation's Motion for Summary Judgment [Doc. 31]. Having considered the record, the parties' briefs, and applicable law, the Court **GRANTS** Eaton's Motion.

## BACKGROUND

Plaintiff McAlister Design Incorporated ("MDI") brings claims for breach of contract and quantum meruit against Defendant Eaton Corporation ("Eaton") arising out of a payment dispute from services Eaton contracted MDI to perform. The parties contract specified MDI was required to submit written change orders if it were to be compensated for additional work outside the scope of the contract. MDI later completed additional work without a written and approved change order from Eaton. Instead, MDI submitted two invoices to Eaton for payment, and when Eaton refused—citing

MDI's failure to comply with the written change order requirement in the contract—MDI sued.

Eaton is an Ohio based power management company that manufactures a variety of products—including superchargers for the automotive industry.[1] On or about February 17, 2017, Eaton issued its Predator AL6 Retrofit Request for Quote ("RFQ") soliciting proposals to modify Eaton's existing assembly line to build new Predator supercharges at its plant in Athens, Georgia.[2] Section 1.1 of the RFQ describes the scope and purpose of the project:

> The following specifications are to be used to quote the addition of the new "Predator" model supercharger PN 376280 to an existing assembly machine (AL6). This assembly machine currently produces a different model supercharger (PN 374201), that is comparable in size and in most processes. The quote must include new fixturing, tooling, programming, error proofing, lift assist devices, material storage/locating, new equipment (if necessary), or necessary modifications to existing equipment.[3]

Section 1.3 of the RFQ states, "[t]his project is to be quoted as 'turn-key' to include all necessary fixtures, tooling, programming, machine acceptance support, training, and documentation required to operate the machine to produce this new model in a production environment."[4] Section 1.4 further specifies Eaton's expectations and states, in bold, "Equipment needs to be functional, accepted/signed off, and ready for

---

[1] Eaton's Statement of Material Facts ("Eaton SOF") at ¶ 1.
[2] *Id.* at ¶¶ 3-4.
[3] RFQ, Exhibit B, [Doc. 31-4], at p. 4.
[4] *Id.*

production of the Predator model at the Eaton, Athens facility no later than 11/01/2017. Vendor kick off is currently expected to be May 2017."[5] Eaton emphasized that "[i]t is critical to complete the project on time as defined in Section 1.4" and discussed potential penalties if the project was not timely completed.[6]

Various sections of the RFQ restrict the manner in which changes to the terms of the RFQ and subsequent contracts may be made and outline the process for doing so. Some of the pertinent sections include:

Section 2.11.3: "If changes prompted by Eaton cause rework of completed equipment or tooling or additional equipment or tooling, Change Orders shall be drawn up by the vendor and approved by Eaton prior to performing the work, if the vendor is to be compensated."[7]

Section 11.3: "Eaton's purchase order takes precedence over any other written or verbal communication. Any change in this order must be acknowledged in writing by Eaton's Purchasing Department. Eaton's acknowledgment must be signed and returned at once or the order may be subject to cancellation."[8]

Section 2.1: No other terms and conditions in any document, including the supplier's quotation, order acceptance, or acknowledgement shall be effective or binding unless expressly agreed to in writing by a representative of Eaton Corporation listed in Section 1.18."[9]

Section 2.2: "Any changes to this agreement or purchase order shall be made in writing, otherwise being null and void. All changes shall be reflected by a revision to this agreement and purchase order number. No other means of communication of a change, whether verbal, electronic, or

---

[5] *Id.*

[6] *Id.* at p. 49.

[7] *Id.* at p. 3.

[8] *Id.* at p. 49.

[9] *Id.* at p. 3.

3

in writing will be acceptable or binding upon either party. Where "Eaton Corporation International Purchase Order Terms and Conditions" will be referred to in the purchase agreement, the reference will be properly attached to this document."[10]

Section 2.3: "When authorizations or approvals are needed for any reason, in association with the machine purchase outlined in this document, only the Eaton associates listed in Section 1.7 are considered authorized to provide these approvals."[11]

Plaintiff MDI is a robotics manufacturing company which specializes in the design, manufacture, and installation of automated assembly lines.[12] MDI's website states that it offers "services on a turn-key or time and material basis."[13] In the Spring of 2017, MDI responded to Eaton's RFQ and submitted multiple proposals, including the proposal ultimately accepted by Eaton—Proposal No. ESAG-1002e ("the Proposal").[14]

The Proposal states that MDI "is pleased to provide [Eaton] with this proposal to provide engineering, programming, hardware/tooling, and installation services to reconfigure the existing AL6 production cell for the additional production of the Predator model."[15] "[B]ased on our meeting in Athens, Georgia and a detailed review of the RFQ (Predator AL6 Retrofit RFQ) and supporting documentation for the existing cell including part models, photographs, videos, and existing robot programs," MDI's proposal quoted $340,000—which included "one new press tooling modules, new leak

---

[10] *Id.* at p. 3-4.
[11] *Id.* at p. 4.
[12] McAlister Deposition, [Doc. 31-11] at 17:5-9.
[13] MDI Website Information, [Doc. 31-3].
[14] Eaton SOF at ¶ 10.
[15] MDI Proposal, Exhibit C, [Doc. 31-5] at p. 2.

check fixturing, one new torque driver system, vision inspection system, two (2) robot end of arm tools, engineering, startup, checkout and documentation."[16]

Eaton accepted the Proposal through four purchase orders ("PO"): PO 134459 in the amount of $150,000; PO 135162 in the amount of $45,600; PO 139098 in the amount of $40,000; and PO 139548 in the amount of $106,400.[17] Each of the original purchase orders incorporated by reference Eaton's Terms and Conditions of Purchase and provided a link to the terms.[18] Pertinent sections of the purchase order terms include:

Section 1.1: This order expressly limits acceptance to the terms and conditions stated in this order, and any additional or different terms or conditions proposed by Seller are rejected unless expressly agreed to in writing by Buyer.[19]

Section 2: Amendments: This order, including these terms and conditions, together with any documents attached or incorporated into this order by reference, is the complete and final contract between Buyer and Seller. No agreement or understanding to modify this order is binding upon Buyer unless in writing and signed by Buyer's authorized representative. All specifications, drawings, and data submitted to Seller with this order or referred to by this order are a part of this order.[20]

Section 4.1: Time is of the essence in the performance of this order. If delivery is not made in the quantities, manner (shipping method), and at the times specified, or rendering of services is not completed at the times specified, Seller must, upon demand by Buyer, promptly

---

[16] *Id.* at p. 2-4.
[17] *See generally,* Eaton's Original Purchase Orders, [Docs. 31-6; 31-7; 31-8; 31-9].
[18] *Id.*; citing "Purchase Order (PO) Terms" Section of
http://www.eaton.com/Eaton/OurCompany/DoingBusiness/SellingtoUs/index.htm.
[19] Purchase Order Terms, Exhibit H, [Doc. 31-10] at p. 2.
[20] *Id.*

reimburse Buyer for any damages Buyer incurred as a result of the delay or failure in delivering the items or providing the services.[21]

Section 23: This agreement is governed, interpreted, and construed by, and in accordance with, the laws of the State of Ohio, United States of America, without regard to the conflict of laws provisions […].[22]

During MDI's 30(b)(6) deposition, owner Troy McAlister ("McAlister") acknowledged that MDI understood the terms in the Purchase Orders and RFQ were binding.

Q: At the very bottom, Section 2.1, will you please read that out for the record, please?

A: Sure. 2.1 says: No other terms and conditions in any document, including the supplier's quotation, order acceptance or acknowledgement shall be effective or binding, unless expressly agreed to in writing by the representative of Eaton Corporation listed in Section 1.18.

[…]

Q: Okay. But with respect to the RFQ in Section 2.1, you would agree, though, that the – that provision states that any additional work would have to be signed off in writing by a representative of Eaton; is that correct?

A: That verbiage is in there, and we agree to that, yes.

Q: Okay. So the next provision under that, which is 2.2, would you please read that out for the record?

A: 2.2, Any changes in this agreement or purchase order shall be made in writing, otherwise being null and void. All changes shall be reflected by a revision in this agreement and purchase order number. No other means of communication of a change, whether verbal, electronic or in writing will be accepted -- acceptable or binding upon either party where Eaton

---

[21] *Id.*

[22] *Id.* at p. 9.

Corporation International purchase order. Terms and conditions will be referred to in the purchase agreement, the reference will be properly attached to this document.

Q: Okay. So you understood that this meant if any changes to the RFQ were to be made, then it would have to be reflected by a revision to the RFQ in a written purchase order; is that correct?

A: That's what it says, yes.

Q: So would you agree, though, that that is what this provision requires?

A: Yes.[23]

McAlister also acknowledged that MDI understood how to seek modifications to the terms of the Predator Contract, as well as the required procedure for claiming additional costs not covered by the RFQ.

Q: Okay. So going back to what we were talking about before with respect to the RFQ – what section was that -- 2.11.3, I -- I just want to confirm, though, that if MDI intended to make a claim for any additional cost that weren't covered by this RFQ and MDIs proposal, then those additional costs and items would have been requested and were required to be requested in a change order, and Eaton needed to approve those additional costs before any additional work could be begin?

MS. TANKERSLEY: Object to form. You can answer if you can.

A: Yes.[24]

After MDI began its work in 2017, it sought—and obtained—a change order from Eaton in the amount of $13,750 for "[a]dditional resources (senior mechanical engineer)

---

[23] McAlister Deposition, at 27:21-29:17.
[24] *Id*. at 37:5-37:17.

to provide accurate, dimensioned, and complete model of AL6 cell areas as necessary for MDI re-design for Predator."[25] Eaton accepted the change order through PO 135807.[26] During MDI's 30(b)(6) deposition, McAlister testified about the procedure MDI followed to obtain PO 135807:

Q: Did Eaton pay this invoice?

A: I believe so.

Q: So this change was fully documented in writing; is that correct?

A: I believe so.

Q: And it's correct that MDI raised this issue with Eaton and requested a purchase order for this additional work; is that correct?

A: Yes, that's correct.[27]

Around October of 2017, MDI encountered challenges with the Predator Contract which required additional work outside the scope of the RFQ. McAlister recounted the situation as follows:

Q: So you referenced a -- a time in 2017 where you said that MDI may have threatened to stop working unless it would be paid for any additional work outside of the scope of RFQ; is that correct?

A: We basically stopped work and we wrote a -- we wrote Eaton a letter about it and we told them we can stop work or we can continue work, you know, and here's -- you know, here's the things that we need to have so that we can continue work. So there was kind of like a choice there for Eaton to make, but we did not have a purchase order to work from.

---

[25] McAlister Deposition, at 99:18-103:22; PO 135807, Exhibit J, [Doc. 31-12].
[26] PO 135807, Exhibit J, [Doc. 31-12].
[27] McAlister Deposition, at 103:24-104:7.

Q: Right. And then Eaton agreed to a $279,000 change order to address those concerns that [were] presented in that letter you sent Eaton back in 2017; is that correct?

A: That's correct.[28]

After negotiations with Eaton, MDI submitted the final change order ("CO11e") for $270,000 on November 2, 2017.[29] CO11e states, in bold, "[t]his is a Turn-Key Price. There will be no further CO's unless a change in scope is requested. Notes: This $279,000 is in addition to the $342,000 referenced in the McAlister Design Proposal dated May 24, 2017 with the filename: ESAG-1002e-sdl.doc."[30] On November 22, 2017, Eaton issued PO 140323, accepting CO11e subject to the terms contained in the purchase order.[31] PO 140323 was the final purchase order Eaton issued to MDI for the Predator Contract. MDI agrees that once Eaton accepted CO11e, it became part of the Predator Contract.[32] Thus, the Predator Contract consisted of the RFQ, the Proposal, PO 134459, PO 135162, PO 139098, PO 139548, PO 135807, CO11e, and PO 140323.

CO11e was the last change order MDI submitted to Eaton. But months after the completion date specified in CO11e, MDI submitted two invoices to Eaton which form the basis of MDI's breach of contract claim: Invoice No. 053118117, dated May 31, 2018,

---

[28] McAlister Deposition at 236:19-237:10.
[29] CO11e, Exhibit K, [Doc. 31-13].
[30] Id.
[31] PO 140323, Exhibit L, [Doc. 31-14].
[32] McAlister Deposition, 117:20-118:19.

for $319,007.23[33] and Invoice No. 121318290, December 13, 2018, for $49,208.89[34] ("the

Disputed Invoices"). When questioned about the Disputed Invoices, McAlister stated:

> Q: It -- are there any written proposals or change orders requesting a change
> in scope following CO11E –
>
> MS. TANKERSLEY: Object to form.
>
> A: THE WITNESS: There are –
>
> Q: yes or no?
>
> A: -- request for change orders, yes.
>
> Q: There are -- there is a change order?
>
> A: We submitted invoices as change orders, yes.
>
> Q: You submitted invoices, but are there any purchase orders or proposals
> from MDI for a change order?
>
> A: I don't have one for something after CO11E.[35]

The parties were unable to resolve the disputed invoices, and MDI filed the

present case seeking damages for breach of contract and quantum meruit. Eaton moved

for summary judgment on both claims. Eaton's Motion is now ripe for ruling.

**LEGAL STANDARD**

Summary judgment is proper if the movant "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[33] Invoice No. 053118117, Exhibit M, [Doc. 31-15].
[34] Invoice No. 121318290, Exhibit N, [Doc. 31-16].
[35] McAlister Deposition at 124:8-22.

law."[36]  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[37]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[38]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[39]  "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[40]  In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[41]  A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[42]  "The

---

[36] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[37] *Catrett*, 477 U.S. at 323 (internal quotation marks omitted).

[38] *See* Fed. R. Civ. P. 56(e); *see also Catrett*, 477 U.S. at 324.

[39] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[40] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

[41] *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[42] *Penley*, 605 F.3d at 848.

court may not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[43]

## DISCUSSION

MDI asserts claims for breach of contract and quantum meruit against Eaton. Under the terms of the Purchase Orders, "[t]his agreement is governed, interpreted, and construed by, and in accordance with, the laws of the State of Ohio, United States of America, without regard to the conflict of laws provisions."[44] The parties do not dispute Ohio law governs the Predator Contract and MDI's claims.  Eaton moved for summary judgment on both claims and contends the Predator Contract and Ohio law bar MDI from recovering on either claim. The Court agrees.

## I.     Breach of Contract

MDI's claim for breach of contract is based on Eaton's refusal to pay $368,216.12 which MDI contends Eaton owes under the Disputed Invoices. Eaton contends the Disputed Invoices have no basis to exist because the Predator Contract's change order provision bars MDI's claim for payment for extra work. MDI contends genuine disputes of material fact exist as to whether the parties orally modified CO11e, the terms of CO11e as modified, Eaton's alleged breach, and whether MDI reasonably notified Eaton

---

[43] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.
[44] Purchase Order Terms, at p. 9.

that it expected payment for work performed outside of the original scope of CO11e.[45]

MDI's contention is without merit. Because MDI failed to comply with the change order

provisions of the Predator Contract, its claim for breach of contract fails as a matter of

law.

Under Ohio law, "a breach of contract occurs when [1] a party demonstrates the

existence of a binding contract or agreement; [2] the non-breaching party performed its

contractual obligations; [3] the other party failed to fulfill its contractual obligations

without legal excuse; and [4] the non-breaching party suffered damages as a result of

the breach."[46] Ohio law directs courts to the plain language of a contract to determine

the parties' intent.[47] The Ohio Supreme Court has held that "where the terms in an

existing contract are clear and unambiguous, this court cannot in effect create a new

contract by finding an intent not expressed in the clear language employed by the

parties."[48] Furthermore, "[a] contract does not become ambiguous by reason of the fact

that in its operation it will work a hardship upon one of the parties thereto."[49]

The Predator Contract unambiguously defines the terms by which it may be

modified. The RFQ specifies:

---

[45] MDI's Response, [Doc. 34].

[46] *Garofalo v. Chicago Title Ins. Co.*, 661 N.E.2d 218 (Ohio Ct. App. 1995) (citing *Nat'l City Bank v. Erksine & Sons*, 110 N.E.2d 598 (Ohio 1953)).

[47] *Graham v. Drydock Coal Co.*, 667 N.E.2d 949 (Ohio 1996) ("The intent of the parties is presumed to reside in the language they choose to use in their agreement.").

[48] *Alexander v. Buckeye Pipeline Co.*, 374 N.E.2d 146, 150 (Ohio 1978).

[49] *Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997).

Section 2.11.3: "If changes prompted by Eaton cause rework of completed equipment or tooling or additional equipment or tooling, Change Orders shall be drawn up by the vendor and approved by Eaton prior to performing the work, if the vendor is to be compensated."[50]

Section 11.3: "Eaton's purchase order takes precedence over any other written or verbal communication. Any change in this order must be acknowledged in writing by Eaton's Purchasing Department. Eaton's acknowledgment must be signed and returned at once or the order may be subject to cancellation."[51]

Section 2.1: No other terms and conditions in any document, including the supplier's quotation, order acceptance, or acknowledgement shall be effective or binding unless expressly agreed to in writing by a representative of Eaton Corporation listed in Section 1.18."[52]

Additionally, the Purchase Order terms state, "[t]his order expressly limits acceptance to the terms and conditions stated in this order, and any additional or different terms or conditions proposed by Seller are rejected unless expressly agreed to in writing by Buyer."[53]

In *Foster*, the Ohio Supreme Court reviewed a contractual provision which required written change orders before commencing additional work.[54] The particular provision in *Foster*, entitled "Change Orders, Additions, and Deductions," stated: "No alterations shall be made in the work shown or described by the plans and specifications, except upon the written order of the Owner, and when so made, the value

---

[50] *Id.* at p. 3.
[51] *Id.* at p. 49.
[52] *Id.* at p. 3.
[53] Purchase Order Terms at p. 2.
[54] *Foster,* 678 N.E.2d at 519.

14

of the work added or omitted shall be computed for approval by the Owner, and the amount so ascertained shall be added to or deducted from the base bid amount."[55] In affirming summary judgement, the Ohio Supreme Court discussed the policy implications and importance of requiring written authorizations:

> The primary purpose of requiring written authorization for alterations in a building or construction contract is to protect the owner against unjust and exorbitant claims for compensation for extra work. It is generally regarded as one of the most effective methods of protection because such clauses limit the source and means of introducing additional work into the project at hand. It allows the owner to investigate the validity of a claim when evidence is still available and to consider early on alternative methods of construction that may prove to be more economically viable. It protects against runaway projects and is, in the final analysis, a necessary adjunct to fiscal planning.[56]

The Ohio Court of Appeals likewise held that "change orders constitute part of the contract between the parties. Thus, a party has no right to unilaterally modify a contract to provide for payment on a basis different from that provided for in a negotiated change order."[57] In *Digioia*, the Plaintiff received extra compensation through a series of change orders. The court stated that "[i]f this did not fully cover plaintiff's expenses for the extra work necessitated by the change order, it is not the place of this court to rectify that. If a change order process is in place and the contractor receives,

---

[55] *Id*. at 525.

[56] *Id*. at 527-28

[57] *Digioia Bros. Excavating v. City of Cleveland*, 734 N.E.2d 438, 451 (Ohio Ct. App. 1999).

extra compensation under it, that contractor may not later go to court seeking further compensation for work done pursuant to the change orders."[58]

Furthermore, Eaton did not waive the written change order requirements under the Predator Contract. In *Foster*, the Ohio Supreme Court addressed the stringent standard to establish waiver for a written change order requirement. The court held "proof of a waiver must either be in writing, or by such clear and convincing evidence as to leave no reasonable doubt about it," and "equivocal conduct, or conduct of doubtful import, is not sufficient."[59] The *Foster* court found "the most that can be inferred from the record is that [the Defendant] had knowledge that alterations involving increases in the quantity of work were being made, and asserted no objection," and concluded that "mere knowledge, and even acquiescence, is not enough for recovery."[60] Additionally, "knowledge of [a contractor's] decision to change the means and methods and/or to incur extra costs does not amount to a waiver of [a] change order provision."[61]

Nothing in the record establishes—by clear and convincing evidence—that Eaton waived the written change order requirement or orally modified the Predator Contract[62]

---

[58] *Id.*

[59] *Foster*, 678 N.E.2d at 528.

[60] *Id.*

[61] *Mike McGarry & Sons, Inc. v. Construction Resources One, LLC*, 107 N.E.3d 91, 116.

[62] Under Ohio law "it is well settled that a party asserting the oral modification of or addition to a written contract must establish that charge by clear and convincing evidence." *Russell v. Daniels-Head & Assocs., Inc.*, No. 1600, 1987 WL 13943 (Ohio Ct. App. June 30, 1987).

to allow MDI to unilaterally submit unapproved invoices as change orders. MDI understood the Predator Contract required it to submit a written change order before commencing any additional work if MDI was to be compensated. MDI complied with this very requirement in securing PO 135807, CO11e, and PO 140323. Through the change orders and corresponding purchase orders, MDI secured an additional $292,750 in compensation above the $342,000 quote in MDI's initial proposal.

Each component of the Predator Contract illustrates that Eaton was seeking a finished product and turn-key agreement. Section 1.3 of the RFQ states, "[t]his project is to be quoted as "turn-key" to include all necessary fixtures, tooling, programming, machine acceptance support, training, and documentation required to operate the machine to produce this new model in a production environment."[63] The record demonstrates the parties intended CO11e to be the final change order. Following the parties' negotiations, the final purchase order, CO11e, unambiguously stated, "[t]his is a Turn-Key Price. There will be no further CO's unless a change in scope is requested."[64] After accepting CO11e, Eaton expected a turn-key price and finished product from MDI.

When MDI later exhausted its funds for the project, it requested a meeting with Eaton to discuss additional funds.[65] When questioned about the Disputed Invoices and MDI's failure to secure a written change order, McAlister stated:

---

[63] RFQ at p.4.
[64] CO11e at p. 3.
[65] McAlister Deposition at 195:16-196:1.

Q: Is there a change order that reflects an agreement made by Eaton to pay an additional -- this additional money discussed in this e-mail?

A: McAlister Design brought it to the table to discuss change order and Eaton would not discuss it. So we did not have a -- you know, we -- we were looking for meeting on it, but Eaton was not willing to come to the meeting and -- because they didn't want us to stop work. And all they wanted us to do was to continue working on the project. They didn't care about how much money we were losing. That didn't matter.[66]

MDI's claims that Eaton orally amended CO11e and waived the requirement in the predator contract to secure written change orders prior to commencing work are without merit. There is no proof of a written waiver, nor is there clear and convincing evidence that Eaton waived the written change order requirement sufficient "to leave no reasonable doubt about it."[67] On the contrary, Eaton's conduct demonstrates its refusal to renegotiate the terms of the Predator Contract after the parties agreed CO11e was "a Turn-Key Price," and unequivocally stated, "[t]here will be no further CO's unless a change in scope is requested."[68] As in *Foster*, the most that can be inferred from the record is that Eaton "had knowledge that alterations involving increases in the quantity of work were being made, and asserted no objection."[69] But "mere knowledge, and even acquiescence, is not enough for recovery."[70]

---

[66] *Id.* at 198:9-21.
[67] *Foster*, 678 N.E.2d at 528.
[68] CO11e at p. 3.
[69] *Foster*, 678 N.E.2d at 528.
[70] *Id.*

MDI failed to demonstrate that Eaton waived the written change order requirement in the Predator Contract. Thus, by submitting unapproved invoices after work was completed, MDI failed to comply with the unambiguous terms of the Predator Contract which required "Change Orders shall be drawn up by the vendor and approved by Eaton prior to performing the work, if the vendor is to be compensated."[71] As the Ohio Court of Appeals noted in *Digioia*, "[i]f [CO11e] did not fully cover plaintiff's expenses for the extra work necessitated by the change order, it is not the place of this court to rectify that."[72] Thus, MDI's claim for breach of contract fails as a matter of law.

## II.     Quantum Meruit

MDI also contends Eaton is liable for the services it performed under the doctrine of quantum meruit, and the Court should deny Eaton's Motion because there is a genuine dispute of material fact regarding MDI's quantum meruit claim. The Court disagrees. "Quantum meruit is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered."[73] To prevail on its quantum meruit claim, MDI is required to show: "(1) a benefit has been conferred by [the] plaintiff upon [the] defendant; (2) the defendant had

---

[71] RFQ at p. 3.

[72] *Digioia*, 734 N.E.2d at 451.

[73] *J. Bowers Constr. Co. v. Gilbert*, 18 N.E.3d 770, 774 (Ohio Ct. App.) (citing *Aultman Hospital Ass'n v. Community Mut. Ins. Co.*, 544 N.E.2d 920 (Ohio 1989)).

knowledge of the benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment."[74]

But Ohio courts have consistently held that "[i]n the absence of fraud, illegality, or bad faith, however, a plaintiff may not recover in quantum meruit when an express contract governs the parties' obligations."[75] The Court finds no evidence of fraud, illegality, or bad faith. Eaton and MDI are highly sophisticated parties who voluntarily contracted for services. MDI undoubtedly knew, as it in fact had previously complied with, the contractually required procedures for securing a change order. Nevertheless, MDI failed to comply with the Predator Contract's written change order requirements by submitting the Disputed Invoices. Because the Predator Contract expressly governed the parties' obligations, and MDI failed to comply with the Predator Contract's unambiguous terms, MDI is barred from recovering for quantum meruit under Ohio law.

## CONCLUSION

Based on the forgoing reasons, Eaton is entitled to summary judgment on MDI's breach of contract and quantum meruit claims. The Court finds MDI's breach of contract claim fails as a matter of law, and MDI is barred from recovering for quantum meruit

---

[74] *J. Bowers*, 18 N.E.3d at 774.

[75] *Zara Constr., Inc. v. Belcastro*, 186 N.E.3d 286, 300 (Ohio Ct. App.) (citing *Aultman*, 544 N.E.2d 920 (Ohio 1989)). *See also Seneca Valley, Inc. v. Caldwell*, 808 N.E.2d 422, 433 (Ohio Ct. App. 2004) ("Absent fraud or illegality, a party to an express agreement may not bring a claim for unjust enrichment, particularly when the express agreement contains a provision governing the allegedly inequitable conduct of the other party.").

under the Predator Contract and Ohio law. Thus, Eaton's Motion for Summary

Judgment [Doc. 31] is **GRANTED.**

      **SO ORDERED,** this 28th day of September, 2022.

s/ C. Ashley Royal_____

C. ASHLEY ROYAL, SENIOR JUDGE

UNITED STATES DISTRICT COURT

CRM